UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re

|  |  |
|---|---|
|  | Chapter 7 |
| EDITH L. MOORE aka | |
| EDITH L. SMALLS, | Case No. 12-41111-CEC |

                              Debtor.
---------------------------------------------------------x
In re

|  |  |
|---|---|
|  | Chapter 7 |
| NATASHA JULIEN aka | |
| KINDA CANDIS JULIEN, | Case No. 12-41115-CEC |

                              Debtor.
---------------------------------------------------------x
In re

|  |  |
|---|---|
|  | Chapter 7 |
| ROBERT J. SILVA, | |
|  | Case No. 12-41671-CEC |

                              Debtor.
---------------------------------------------------------x
In re

|  |  |
|---|---|
|  | Chapter 7 |
| LATESHA S. SHAW | |
|  | Case No. 11-47675-CEC |

                              Debtor.
---------------------------------------------------------x

<u>DECISION</u>

APPEARANCES:

Lance Lazzaro, Esq.
Lazzaro Law Firm
360 Court Street
Brooklyn, New York 11231
Attorney for Peter Mollo

David H. Perlman, Esq.
Law Office of David H. Perlman
186 Montague Street
Brooklyn, New York 11201
Attorney for Anna Pevzner

Alicia Leonhard, Esq.
Marylou Martin, Esq.
Greg M. Zipes, Esq.
Office of the United States Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004

CARLA CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the motion of the United States Trustee for Region 2 (the "UST") seeking sanctions against, and to compel the disgorgement of fees from, Peter J. Mollo and Anna Pevzner, a/k/a Anna Rutitskaya, for violations of  § 110 of Title 11 of the United States Code (the "Bankruptcy Code").[1]  The UST alleges that Ms. Pevzner, as Mr. Mollo's employee, acting as a bankruptcy petition preparer, violated of § 110 in three bankruptcy cases by failing to sign and include identifying information on documents filed with the Court, failing to file disclosures of compensation, and improperly providing legal advice.  The UST further alleges that Ms. Pevzner and Mr. Mollo engaged in the unauthorized practice of law. Based on these alleged violations, the UST seeks fines and disgorgement of fees totaling $18,700 jointly and severally against Ms. Pevzner and Mr. Mollo.  For the reasons set forth below, the UST's motion is granted, except that the fines imposed are tripled as required by § 110(l)(2), and fees to be disgorged are reduced by $600.  Accordingly, Ms. Pevzner and Mr. Mollo are liable jointly and severally for fines and disgorgement of fees totaling $48,100.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1996.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

This is the UST's second motion for sanctions involving Peter J. Mollo this year.  The first, filed on January 31, 2012, sought sanctions against Mr. Mollo for filing bankruptcy cases

---

[1] Unless otherwise indicated, statutory citations are to provisions of Title 11 of the United States Code.

after he was suspended from the practice of law,[2] three of which he filed by forging another attorney's electronic signature.  Pursuant to a decision and order entered on March 22, 2012, the UST's motion was granted, and Mr. Mollo was directed to reimburse each of the clients in question, pay any additional legal fees incurred by those clients, pay a fine of $3,000 to the Clerk of the Court, and forfeit his access to this Court's electronic filing system. See In re Flowers, 2012 WL 987298 (Bankr. E.D.N.Y. Mar. 22, 2012).

On March 30, 2012, the UST filed the instant motion seeking sanctions and an order to show cause against Mr. Mollo and his paralegal, Ms. Pevzner, based on violations of § 110 relating to the preparation of two bankruptcy petitions.  Specifically, the UST asserted that Ms. Pevzner, while acting as an employee of Mr. Mollo, filed bankruptcy petitions for Edith Moore and Natasha Julien on February 17, 2012, without signing the documents or including the identifying information required by § 110.  Although the petitions appeared to have been filed pro se, with no indication that either debtor received assistance from an attorney or a bankruptcy petition preparer, the UST became aware of Ms. Pevzner's and Mr. Mollo's involvement in the cases when the debtors stated, at their respective meetings of creditors pursuant to § 341 ("341 meeting"), that they believed Mr. Mollo or Ms. Pevzner was representing them.  After further inquiry, the UST was told by the debtors that both had visited Mr. Mollo's office, paid fees of at least $1,200, and had their petitions prepared and filed by Ms. Pevzner.

On March 30, 2012, an order was entered directing Mr. Mollo and Ms. Pevzner to show cause at a hearing scheduled for April 10, 2012 (the "OSC") why they should not be sanctioned for the conduct alleged in the UST's motion.  An evidentiary hearing was held on April 10, 2012, and adjourned to May 30, 2012.  After the April 10 hearing, it came to the UST's attention that

---

[2] On January 9, 2012, the Appellate Division, Second Department, of the Supreme Court of the State of New York suspended Mr. Mollo's license to practice law.

Ms. Pevzner filed bankruptcy petitions after Mr. Mollo's suspension on behalf of two additional debtors, Robert Silva and Latesha Shaw, and on May 8, 2012, an order was issued directing Ms. Pevzner and Mr. Mollo to show cause why they should not be further sanctioned for their conduct in the Silva and Shaw cases.

I.    Testimony and Evidence Presented at April 10, 2012 Hearing

At the hearing held on April 10, 2012, Ms. Julien and Ms. Pevzner testified.

A.  Natasha Julien's Testimony

Ms. Julien testified that she learned of Mr. Mollo by searching the internet for bankruptcy attorneys. (Tr. 4/10/12 at 16:11-15.) [3]  After calling the number listed on Mr. Mollo's website, Ms. Julien spoke with Ms. Pevzner and arranged an appointment.  (Tr. 4/10/12 at 16:11-16.)  Ms. Julien stated that during their phone conversation, Ms. Pevzner told her that the fee would be $1,300 and told her what documentation she needed to bring to the appointment.  (Tr. 4/10/12 at 17:7-20.)  A receipt dated February 10, 2012, signed by Ms. Pevzner, with the name "Alan Bond, Esq." on the letterhead evidences payment of $1,300 by Ms. Julien.  (UST Ex. 12.)

 Ms. Julien testified that, when she met with Ms. Pevzner at Mr. Mollo's office in mid-February to prepare her bankruptcy petition, Ms. Pevzner "filled it out, she asked me the questions." (Tr. 4/10/12 at 15:20-24; 16:1-10; 26:21-24.)  Ms. Julien further testified that she was told that when she went to court, she would be accompanied by either "[Ms. Pevzner] or Mr. Mollo."  (Tr. 4/10/12 at 40:13-18.)  Ms. Julien testified that each time she called the office, the phone was answered "Peter Mollo's office."  (Tr. 4/10/12 at 39:5-8.)  The UST also introduced into evidence a letter received from Mr. Mollo's office address notifying Ms. Julien of her

---

[3] "Tr." refers to the transcripts for the hearings held on April 10, 2012 and May 30, 2012.  Citations to the transcript are by date, page number, and line.

upcoming meeting of creditors and outlining the documentation that should be brought to the meeting.  (UST Ex. 23.)

During Ms. Julien's testimony, the UST also introduced into evidence the retainer agreement signed by Ms. Julien, which indicates that she retained "Alan C. Bond, Esquire" as her counsel.  (UST Ex. 20.)  Ms. Julien was unable to explain who Alan C. Bond was, and in fact, testified that she "just noticed [his name] now."  (Tr. 4/10/12 at 22:22-25.)  Ms. Julien did not recall meeting Mr. Bond.  (Tr. 4/10/12 at 23:1-2.)

B.  Anna Pevzner's Testimony

Ms. Pevzner testified that she volunteers at Mr. Mollo's office.  (Tr. 4/10/12 at 57:4-12.) When asked whether she was ever employed by Mr. Mollo, Ms. Pevzner stated that, until Mr. Mollo's suspension, she was "coming in, coming out on a part-time basis, but usually no." (Tr. 4/10/12 at 57:22-24.)  Ms. Pevzner explained that she has never been paid a salary by Mr. Mollo, although he has helped her pay certain bills.  (Tr. 4/10/12 at 61:11-19.)  Ms. Pevzner estimates she has received, in total, approximately $2,500 from Mr. Mollo.  (Tr. 4/10/12 at 62:3-6.)

Ms. Pevzner testified that she had prepared petitions as a volunteer for Mr. Mollo within the prior six months, including the petitions of Natasha Julien and Edith Moore.  (Tr. 4/10/12 at 58:21-59:4.)   Ms. Pevzner considers herself a bankruptcy petition preparer, and testified that she was aware that there are legal requirements that must be met when a bankruptcy petition is prepared by a non-attorney.  (Tr. 4/10/12 at 60:15-61:3.)  Although Mr. Mollo had pledged that he and his employees would not file any more bankruptcy petitions, Ms. Pevzner believed her filing of these additional petitions was acceptable because she filed the petitions on a "freelance" basis.  (Tr. 4/10/12 at 62:19-25.)

In preparing the petitions, Ms. Pevzner explained that she input information into a program on a computer in Mr. Mollo's office.  (Tr. 4/10/12 at 69:17-70:2-14.)  The program, Ms. Pevzner testified, gives the option of selecting between New York State or Federal exemptions, and Ms. Pevzner testified that she elected to use the New York State exemptions for both debtors.  (Tr. 4/10/12 at 72:8-20.)  When asked why she failed to sign any of the documents or include the identification number called for by § 110(c)(1), Ms. Pevzner said that it was an "honest mistake."  (Tr. 4/10/12 at 68:14.)

With respect to Alan Bond, Ms. Pevzner testified that she had met him on one occasion, shortly after Mr. Mollo's law license was suspended.  (Tr. 4/10/12 at 74:11-14.)  She stated that she met him at Mr. Mollo's office, and that he told Ms. Pevzner that he would "assist" her.  (Tr. 4/10/12 at 80:16-25.)  She further stated that she "told him that maybe once in a while I will do bankruptcy and I will need an attorney to assist me. He say, okay, I will do it.  And need lawyer, the discussion didn't come up, and I saw him only once." (Tr. 4/10/12 at 80:23-81:1.)  For this reason, Ms. Pevzner testified, she prepared retainer agreements for Ms. Julien and Ms. Moore with Alan Bond's name on them.  (Tr. 4/10/12 at 80:16-18.)  Although the retainer agreements stated that Mr. Bond was retained as the attorney representing the debtors in both cases, Ms. Pevzner testified that none of the money she received was ever given to him, and that she did not have a phone number or address at which she could contact him.  (Tr. 4/10/12 at 81:22-24; 83:7-12.)  Ms. Pevzner testified that if she needed to contact Mr. Bond, she would "google" him or look him up in the yellow pages.  (Tr. 4/10/12 at 87:2-4.)

II.     Additional Allegations

On April 19, 2012, Robert J. Silva filed a motion seeking reimbursement from Ms. Pevzner of the $1,200 he paid to her to handle his bankruptcy.  Mr. Silva sought the

reimbursement because Ms. Pevzner failed, among other things, to timely file his tax returns and appear at the hearing on his case.

On April 23, 2012, Greg Zipes, an attorney in the Office of the UST, filed a declaration, stating that in addition to the Silva case, the UST had learned that Ms. Pevzner was involved in the filing of the bankruptcy petition of Latesha Shaw. The UST requested that Ms. Pevzner and Mr. Mollo's involvement in these two cases be considered at the May 30, 2012 hearing.

On May 8, 2012, an order to show cause was issued, directing Mr. Mollo and Ms. Pevzner to further show cause at the May 30, 2012 hearing why they should not be sanctioned for their conduct in the Silva and Shaw bankruptcy cases.

III.    Testimony and Evidence Presented at May 30, 2012 Hearing

On May 30, 2012, a second hearing was held on the UST's motion. At this continued hearing, Ms. Moore, Mr. Silva, Ms. Pevzner, and Mr. Mollo testified.

A.    Edith Moore's Testimony

Edith Moore testified that a friend referred her to Mr. Mollo and provided her with his phone number. (Tr. 5/30/12 at 24:6-23.) Ms. Moore testified that she called Mr. Mollo's office and spoke with Ms. Pevzner, who gave her Mr. Mollo's cell phone number. (Tr. 5/30/12 at 25:14-15.) She called Mr. Mollo's cell phone and spoke with him on February 9, 2012 and was told by him to contact Ms. Pevzner to arrange an appointment, and "he will be there." (Tr. 5/30/12 at 25:15-17.) Ms. Moore then called Mr. Mollo's office again, spoke with Ms. Pevzner, and scheduled an appointment for February 10, 2012. (Tr. 5/30/12 at 25:18-20; 26:7-10.)

Ms. Moore testified that, when she came to her appointment at Mr. Mollo's office, both Mr. Mollo and Ms. Pevzner were present. (Tr. 5/30/12 at 26:11-14.) Ms. Moore stated that she "put the money in Mr. Mollo's hand," and that "Anna took all the information and I signed the papers." (Tr. 5/30/12 at 26:19-22.) Ms. Moore further testified that Mr. Mollo did not ask her any questions relating to her petition, only telling her that "Anna will be there in court, and he wanted the money." (Tr. 5/30/12 at 27:7-10.) Ms. Moore was charged $1,200 for these services, and because Mr. Mollo insisted upon payment in cash, Ms. Moore paid $600 to Mr. Mollo at the meeting, which was the amount of cash she had brought with her. (Tr. 5/3012 at 35:14-25.)

Ms. Moore testified that she did not know whether Mr. Mollo was her attorney, but knew that Mr. Mollo and Ms. Pevzner were preparing her bankruptcy filing, and that Ms. Pevzner would appear with her in court. (Tr. 5/30/12 at 38:1-11.)

The UST also introduced into evidence the receipt and retainer agreement that Ms. Pevzner prepared for Ms. Moore. (UST. Exs. 7, 11.) Both documents list Alan C. Bond, Esq. as Ms. Moore's attorney. Ms. Moore testified that she did not know who Mr. Bond was. (Tr. 5/30/12 at 36:1-5.)

### B. Robert Silva's Testimony

Mr. Silva testified that he was referred to Mr. Mollo by his grandmother's financial advisor. (Tr. 5/30/2012 at 54:8-9.) After setting up an appointment with Ms. Pevzner, Mr. Silva met with her at Mr. Mollo's office on February 29, 2012 for three to four hours. (Tr. 5/30/2012 at 54:1-5.) Mr. Silva testified that he did not meet with Mr. Mollo, although Mr. Mollo was briefly present at the office during a later meeting between Mr. Silva and Ms. Pevzner. (Tr. 5/30/2012 at 57: 20-23.)

Mr. Silva stated that he paid Ms. Pevzner a $1,200 fee in two installments. (Tr. 5/30/2012 at 61:2-4.)  For each payment, Ms. Pevzner provided a receipt.  The first receipt referenced Alan Bond, who Mr. Silva testified he did not know or ever meet. (Tr. 5/30/12 at 64:9-10; 64:14-65:6; UST Ex. 24.)   The second receipt referenced "Brooklyn Legal Services," which Mr. Silva was equally unfamiliar with.  (Tr. 5/30/12 at 65:21-25; UST Ex. 24.)    The retainer agreement that Mr. Silva signed was with Brooklyn Legal Services. (UST Ex. 24.)  However, Mr. Silva testified that he believed it was Ms. Pevzner who was representing him.  (Tr. 4/10/12 at 55:17-20; 68:5-8)

C.  <u>Anna Pevzner's Testimony</u>

Ms. Pevzner testified again at the May 30, 2012 hearing.  She stated that she has been providing services at Mr. Mollo's office since 2006, including fielding letters and answering the phone, and agreed that her hours working at Mr. Mollo's office have been "fairly regular."  (Tr. 5/30/12 at 75:4-12; 19-21.)  Nevertheless, she objected to the description of herself as a member of Mr. Mollo's staff, and repeated that she was a volunteer who did not receive a salary, though she acknowledged that she received monthly payments at least during 2010, 2011, and 2012. (Tr. 5/30/12 at 73:22-24; 79:1-13.)  Ms. Pevzner described these payments as "favors for the services.  I was coming to his office as [a] friend, and if he ask[ed] me to type a letter, pick up the phone if [it] rings, I was doing it."  (Tr. 5/30/12 at 83:3-8.)  Later Ms. Pevzner testified that she would not go to Mr. Mollo's office every day, with her schedule varying from week to week. (Tr. 5/30/12 at 84:3-9.)  Ms. Pevzner stated that her hours at Mr. Mollo's office varied from one hour per day to five hours per day.  (Tr. 5/30/12 at 84:10-15.)

At the hearing, the UST introduced into evidence the online resume of Ms. Pevzner from the website, LinkedIn, downloaded on May 9, 2012. (UST. Ex. 33.)  The profile states that Ms.

Pevzner works at the Law Office of Peter Mollo.  Ms. Pevzner testified that she prepared the profile.  (Tr. 5/30/12 at 105:8-20.)

When asked about Brooklyn Legal Services, Ms. Pevzner explained that she was its sole employee, she operated it out of Mr. Mollo's office, and its business consisted of filling bankruptcy petitions.  (Tr. 5/30/12 at 85:21- 86:15.)  Ms. Pevzner testified that Mr. Mollo knew that Brooklyn Legal Services was operating in of his office.  (Tr. 5/30/12 at 86:3-4.)

Ms. Pevzner testified again about Mr. Alan Bond at the May 30, 2012 hearing.  While at the first hearing, Ms. Pevzner stated that she had only met Mr. Bond once, Ms. Pevzner testified at the May 30, 2012 hearing that she met Mr. Bond "[o]ne time this year, and maybe dozen times since 2010."  (Tr. 5/30/12 at 92:23-25.)  She acknowledged that she prepared the retention agreements that list Alan Bond as counsel.  (Tr. 5/30/12 at 95:19-21; 97:1-6.)  She also acknowledged that she had no way to reach Mr. Bond.  (Tr. 5/30/12 at 97:9-11.)  Ms. Pevzner stated that Mr. Mollo was aware that Ms. Pevzner was using Mr. Bond's name on retainer agreements and had received Mr. Bond's permission to do so.  (Tr. 5/30/12 at 96:13-22.)

At the May 30, 2012 hearing, Ms. Pevzner testified that she has had two surgeries to combat brain tumors in the past ten years. (Tr. 5/30/12 at 110: 18-19.)  Ms. Pevzner stated that these surgeries had diminished her long and short term memory.  (Tr. 5/30/12 at 111: 15-20.)

D.  Peter Mollo's Testimony

According to Mr. Mollo, he was not involved with the bankruptcy filings of Ms. Moore, Ms. Julien, and Mr. Silva.  (Tr. 5/30/12 at 132: 11-20.)  Mr. Mollo explained that he stays away from Ms. Pevzner when she meets with individuals to prepare bankruptcy petitions.  He stated that he does not even introduce himself to any such individuals nor does he receive any money from them.  (Tr. 5/30/12 at 132:11-20; 133:22- 134:11.)

When asked whether Ms. Pevzner performs services for him, Mr. Mollo testified as follows: "Ms. Pevzner and I are friends. I'm a retired teacher, she's on disability, we help each other. I can't look at the four walls and do nothing, and neither can she. I explained that to you as well. It's an informal relationship." (Tr. 5/30/12 at 117:14-17.) Mr. Mollo stated that when he was a practicing attorney, he never really had a staff; rather, Ms. Pevzner and his stepson "helped [him] once in a while" and he "had a bunch of friends who helped [him] as well." (Tr. 5/30/12 at 118: 19-24.) Mr. Mollo stated that there was time when he had his stepson and another employee "on the books," but that he "couldn't sustain it…couldn't afford it." (Tr. 5/30/12 at 138: 3-7.) Although Mr. Mollo's website stated "Peter Mollo and his staff will answer questions," Mr. Mollo explained that "[t]hat's puffery, that's advertising." (Tr. 5/30/12 at 121: 6-10; UST Ex. 14.)

With respect to the money Mr. Mollo gave Ms. Pevzner, he testified that "[i]t has to do with what her needs are. It has to do with what's going on in the office." ((Tr. 5/30/12 at 138: 10-15.) Mr. Mollo further explained that, "if there's no income, there's nothing to share, there's no gift. If there's enough income, then there can be." (Tr. 5/30/12 at 138:24-139:1.)

During his testimony, Mr. Mollo also answered questions from counsel to the UST about Mr. Bond. Mr. Mollo testified that he had made plans for Alan Bond to work at his office, but that once Mr. Bond became ill and was hospitalized during February 2012, the plan never materialized. (Tr. 5/30/12 at 131: 3-6; 132: 1-3.) Mr. Mollo testified that Mr. Bond had nothing to do with any of the filings that are the subject of the UST's motion. (Tr. 5/30/12 at 132: 8-10.)

IV.    Post-Trial Filings

On June 21, 2012, the UST filed its amended post-trial memorandum of law in support of its motion for sanctions, seeking sanctions against Mr. Mollo and Ms. Pevzner for violations of

five provisions of § 110 in the bankruptcy cases of Ms. Julien, Ms. Moore, and Mr. Silva.  The UST no longer seeks sanctions relating to the Latesha Shaw bankruptcy case.

The UST argues that the evidence elicited at the hearings shows that Ms. Pevzner failed to sign any of the filings in any of the three cases as required by § 110(b)(1), or to place the requisite identifying number on any of the documents as required by § 110(c)(1), improperly provided legal advice in all three cases in violation of § 110(e)(2), failed to file a disclosure of compensation in any of the three cases as required by §110(h)(2), and engaged in the unauthorized practice of law.  The UST does not seek sanctions against Mr. Mollo based on Rule 9011 or § 105, but instead argues that Mr. Mollo should be held vicariously liable for Ms. Pevzner's violations of § 110 under the doctrine of respondeat superior. The UST further argues that Mr. Mollo also directly engaged in the unauthorized practice of law.  The UST argues that Ms. Pevzner and Mr. Mollo should be fined, jointly and severally, in the amount of $15,000, and directed to disgorge $3,700 in fees to the three debtors.

On June 27, 2012, Ms. Pevzner filed an affirmation in opposition to the UST's motion. In Pevzner's affirmation, she explains that she suffers from Attention Deficit Disorder and memory problems stemming from invasive surgeries and radiation treatments for a brain tumor. Ms. Pevzner does not dispute that she performed the work alleged by the UST, except that she denies that she ever provided legal advice. Ms. Pevzner states that her mistakes were innocent ones resulting from her "mental and physical health problems."

Mr. Mollo also filed an affirmation in opposition to the UST's motion on June 27, 2012. In his opposition, Mr. Mollo argues that, although he was aware that Ms. Pevzner was preparing petitions in his office, he did not supervise the process nor did he profit from it.  As evidence that he was uninvolved in the these cases, Mr. Mollo points to the testimony of Ms. Moore and Mr.

Silva, both of whom he asserts testified that they had never met him, and to Ms. Julien's

testimony that he told her that he would not represent her in court.  Mr. Mollo's reliance on Ms.

Moore's testimony is difficult to understand; she testified that she met with Mr. Mollo and with

Ms. Pevzner and that she paid him $600 cash ("I put the money in Mr. Mollo's hand").  (Tr.

5/30/12 at 26:10-22.)    In his affirmation, Mr. Mollo also reiterated that he does not employ Ms.

Pevzner, describing his office as a "sheltered workshop" for Ms. Pevzner and his stepson, given

that neither could hold a regular job due to health and personal problems.  In support of his

affirmation, Mr. Mollo filed several letters from former clients attesting to the quality of his

work and character.

## **DISCUSSION**

The UST seeks sanctions and the disgorgement of fees based on alleged violations of §

110.  "Section 110 provides for monetary sanctions and injunctive relief against bankruptcy

petition preparers who violate the provisions of that section."  In re France, 271 B.R. 748, 754

(Bankr. E.D.N.Y. 2002).   The purpose of Section 110 is "to protect consumers from abuses by

non-lawyer bankruptcy petition preparers."  In re Bradshaw, 233 B.R. 315, 325 (Bankr. D.N.J.

1999).  Since the provisions of § 110 are only applicable to bankruptcy petition preparers, the

threshold inquiry is whether Ms. Pevzner acted as a bankruptcy petition preparer for purposes of

§ 110.

Pursuant to § 110(a), a bankruptcy petition preparer is defined as " a person, other than an

attorney for the debtor or an employee of such attorney under the direct supervision of such

attorney, who prepares for compensation a document for filing."  11 U.S.C. § 110(a)(1).  Here,

Ms. Pevzner was acting as a bankruptcy petition preparer within the definition of § 110(a)(1)

when she prepared and filed bankruptcy petitions for Ms. Moore, Ms. Julien, and Mr. Silva.  Ms.

Pevzner testified that she prepared and filed all three petitions in question.  It is also undisputed that each debtor paid for this service. Finally, Ms. Pevzner was not employed by or under the supervision of an attorney for the debtor who was authorized to practice law. Ms. Pevzner testified that she considers herself a bankruptcy petition preparer:

> Q: Do you consider yourself to be a bankruptcy petition preparer under the Bankruptcy Code?
>
> A: Yes, I do.

(Tr. 4/10/12 at 61: 1-3.)

Accordingly, because Ms. Pevzner was clearly and admittedly acting as a bankruptcy petition preparer in each of these three cases, her conduct falls within the purview of § 110.

I.    Section 110(b)(1)

The UST alleges that Ms. Pevzner violated § 110(b)(1).  Section 110(b)(1) requires bankruptcy petition preparers, when preparing a document to file, to "sign the document and print on the document the preparer's name and address." 11 U.S.C. § 110(b)(1). Section 110(a)(2) defines "a document for filing" as a "petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under this title." 11 U.S.C. § 110(a)(2).  Given this broad definition, courts interpret "petitions, plans, schedules, statements, certifications, motions and other documents filed in bankruptcy cases [as] separate 'document[s] for filing' for purposes of section 110." Bradshaw, 233 B.R. at 326 (collecting cases).

Here, the UST argues that Ms. Pevzner violated § 110(b)(1) by failing to sign or print her name and address on the 1) petitions, 2) schedules, 3) statements of financial affairs, and 4)

means tests of each of the three debtors.  Accordingly, the UST asserts four violations occurred in each case for a total of twelve violations of § 110(b)(1).

All of the documents in question have been admitted into evidence and none contains Ms. Pevzner's name or address as § 110(b) requires.  (UST Exs. 4, 6, 23.)  Ms. Pevzner does not dispute that she failed to properly sign or print her name and address on each of the documents in question.  Rather, she attributes her failure to comply with the requirements of § 110(b) to memory problems and characterizes her failings as "honest mistakes."

Given that Ms. Pevzner testified that she was aware that there were specific legal requirements that must be complied with when non-attorneys prepare bankruptcy petitions, and the fact that these omissions occurred on every document in every case, Ms. Pevzner's testimony is neither credible nor persuasive.

Section 110(l)(1) provides that "[a] bankruptcy petition preparer who fails to comply with any provision of subsection (b), (c), (d), (e), (f), (g), or (h) may be fined not more than $500 for each such failure."  11 U.S.C. § 110(l)(1).  The UST seeks a $500 sanction for each of the twelve violations of § 110(b).  In light of Ms. Pevzner's repeated failure to comply with the requirements of § 110(b), the sanctions the UST seeks are appropriate.  Therefore, based on Ms. Pevzner's twelve violations of § 110(b), the UST's request for a fine totaling $6,000 is granted.

II.    Section 110(c)(1)

The UST also seeks fines against Ms. Pevzner for her failure to comply with the requirements of § 110(c)(1).  Section 110(c)(1) requires bankruptcy petition preparers, in addition to signing all documents that they prepare for filing, to "place on the document, after the preparer's signature, an identifying number that identifies individuals who prepared the document." 11 U.S.C. § 110(c)(1).  When a bankruptcy petition preparer is an individual, §

110(c)(2)(A) provides that the identifying number to be used "shall be the Social Security account number of each individual who prepared the document or assisted in its preparation." 11 U.S.C. § 110(c)(2)(A).

The UST asserts that Ms. Pevzner violated this provision in all three cases on each of the four documents discussed in the preceding section for a total of twelve violations. The UST also seeks a $500 fine for each of these twelve violations pursuant to § 110(l)(1).

All of the documents in question have been admitted into evidence, and Ms. Pevzner's identification number is absent from each. (UST Exs. 4, 6, 23.) Given that the evidence clearly establishes that Ms. Pevzner failed to comply with § 110(c)(1), the UST's request for $6,000 in fines, based on Ms. Pevzner's violations of § 110(c)(1), is granted.

III.    Section 110(h)(2)

The UST additionally seeks fines totaling $1,500 against Ms. Pevzner for her failure to comply with § 110(h)(2), which requires that "[a] declaration under penalty of perjury by the bankruptcy petition preparer shall be filed together with the petition, disclosing any fee received from or on behalf of the debtor within 12 months immediately prior to the filing of the case, and any unpaid fee charged to the debtor . . ." Federal Rule of Bankruptcy 2016(c) specifies that the declaration "shall also describe the services performed and documents prepared or caused to be prepared by the bankruptcy petition preparer," and requires the bankruptcy petition preparer to deliver this declaration to the debtor before the debtor's petition is filed. Fed. R. Bankr. P. 2016(c). Official Bankruptcy Form B290, when properly completed and filed with the petition, satisfies the requirements of § 110(h)(2) and Bankruptcy Rule 2016(c).

Here, although the evidence shows Ms. Julien, Ms. Moore, and Mr. Silva each paid Ms. Pevzner or Mr. Mollo for services in connection with their bankruptcy filings, no disclosures of

compensation were filed in any of the cases.   Accordingly, the UST seeks the imposition of the $500 fine, as permitted under § 110(l)(1), for the violation of § 110(h)(2) in each case.

The requested $1,500 fine is appropriate under these circumstances.  Not only did Ms. Pevzner receive compensation that should have been disclosed under § 110(h)(2), but the evidence demonstrates that she was able to receive extra compensation by charging rates more consistent with those of an attorney by using the name of Alan Bond, Esq., although Ms. Pevzner admitted that Mr. Bond had no involvement in any of these cases. See, e.g., In re McDonald, 318 B.R. 37, 46 (Bankr. E.D.N.Y. 2004) (finding that a rate of $50 per hour is appropriate for a bankruptcy petition preparer).  In light of that conduct, and Ms. Pevzner's complete failure to disclose any of the compensation she received in these cases, the $1,500 fine sought by the UST for the violations in the three cases is warranted.

IV.    Section 110(e)(2)

The UST also alleges that Ms. Pevzner violated § 110(e)(2)(A) in each of the three bankruptcy cases in question.  Section 110(e)(2)(B) expressly prohibits bankruptcy petition preparers from providing "legal advice."   However, § 110(e)(2)(A) does not prevent petition preparers from engaging in other aspects of the practice of law.  See Wynns v. Adams, 426 B.R. 457, 462 (E.D.N.Y. 2010) (finding that that the bankruptcy court "erred in assuming that 'any legal advice' means the same thing as 'the practice of law'").

In the instant cases, the UST argues that Ms. Pevzner provided "legal advice," and thereby violated § 110(e)(2)(A), by: 1) making legal decisions when preparing the debtors' petitions, schedules, statements of financial affairs and means tests; 2) explaining to the debtors letters that were received from creditors or the Court; and 3) sitting beside Ms. Moore at her meeting of creditors.

The evidence reflects that Ms. Pevzner did provide legal advice in preparing the debtors' petitions. The debtors were consistent in their testimony: Ms. Pevzner asked them a series of questions about their assets and liabilities and used the answers to complete bankruptcy forms on a computer program. There is no question that "[b]ankruptcy petition preparers may legally 'type or otherwise prepare the forms and schedules that comprise the Debtor's Petition.'" Wynns v. Adams, 426 B.R. at 463 (quoting McDonald, 318 B.R. at 46.) However, [b]ankruptcy petition preparers cross the line when "they do more than that, such as by selecting information used to claim exemptions under Schedule C." Id.

Ms. Pevzner crossed that line in each of these cases. As an initial matter, Ms. Pevzner testified that she elected to use the New York exemptions as opposed to the federal exemptions for each debtor. (Tr. 4/10/12 at 72: 15-20.) Furthermore, a review of the debtors' filings shows that Ms. Pevzner went well beyond merely inputting provided information. Schedule C filed by each debtor shows particular items claimed to be exempt. These elections are most certainly the product of Ms. Pevzner's advice and judgment given the testimony of the debtors. For example, Ms. Julien's testimony evidenced that she was not familiar with the terms "real property" or "IRS housing and utility standards" or with the concept of exemptions. (Tr. 4/10/12 at 27: 16-20; 31: 19-21; 33: 8-17.) Similarly, Mr. Silva testified that he "wouldn't know where to begin . . ." (Tr. 5/30/12 at 66: 12-18.) Given their lack of familiarity with these concepts, the debtors could not have claimed the exemptions they did absent Ms. Pevzner's advice.

Ms. Pevzner, however, did not provide "legal advice," as the UST asserts, by explaining a creditor's letter to Mr. Silva or by appearing at Ms. Moore's 341 meeting. The UST's allegation regarding the explanation of a creditor's letter is based solely on Mr. Silva's testimony that he brought a creditor's letter to Ms. Pevzner and "she explained it to me." (Tr. 5/30/12 at

58:9-14.) This testimony alone is insufficient to establish that Ms. Pevzner provided Mr. Silva legal advice. In <u>Wynns</u>, the court, in addressing a bankruptcy petition preparer's explanation of a notice from the Bankruptcy Court to a debtor, noted that "lawyers have no monopoly on reading court communications." 426 B.R. at 464. Similarly, here, without additional evidence, it is not possible to determine whether Ms. Pevzner's explanation of the creditor's letter involved the provision of any legal advice.

The record is also insufficient to conclude that Ms. Pevzner's presence beside Ms. Moore at her meeting of creditors constituted the provision of legal advice. The UST cites to no testimony indicating what Ms. Pevzner said, if anything, at the 341 meeting in question. Accordingly, without additional evidence, Ms. Pevzner's mere presence at the meeting is not a violation of § 110(e)(2)(A).

The UST seeks a $500 fine against Ms. Pevzner in each case for violations of § 110(e)(2)(A). Although not all of Ms. Pevzner's alleged conduct constituted the provision of legal advice for purposes of § 110(e)(2)(A), it was established that, in preparing the debtors' petitions, Ms. Pevzner provided legal advice. Accordingly, the UST's request for a $1,500 fine for violations of § 110(e)(2)(A) is granted.

V.    Tripling of Fines Under § 110(l)(2)

Section 110(l)(2) mandates that a court "shall triple the amount of a fine assessed under paragraph (1) in any case in which the court finds that the bankruptcy petition preparer…(D) prepared a document for filing in a manner that failed to disclose the identity of the bankruptcy petition preparer." Because Ms. Pevzner failed to disclose her identity in any manner on the documents prepared in these cases, the court is required to triple the fines imposed under § 110(l)(1). See In re Hennerman, 351 B.R. 143, 157 (Bankr. D. Colo. 2006) ("Under 11 U.S.C. §

110( l)(2)(D) the court is required to treble the fines assessed under § 110( l)(1) if the court finds

that the bankruptcy petition preparer, 'prepared a document for filing in a manner that failed to

disclose the identity of the bankruptcy petition preparer'); In re Springs, 358 B.R. 236, 247

(Bankr. M.D.N.C. 2006) (Section 110(l)(2)(D) requires the court to triple fines where there was

no indication of the petition preparer's identity on the submitted documents).  Accordingly, the

fines imposed above for Ms. Pevzner's violations of § 110(b), (c),(h), and (e) in the aggregate

amount of $15,000 must be tripled to $45,000.

     VI.    Disgorgement of Fees Based on Sections 110(h)(3)(B) and 110(k)

    In addition to seeking sanctions, the UST also seeks to require Ms. Pevzner and Mr.

Mollo to disgorge the fees received from Ms. Julien, Ms. Moore, and Mr. Silva pursuant to §§

110(h)(3)(B) and 110(k).

    A.  Section 110(h)(3)(B)

    Section 110(h)(3)(B) provides that "[a]ll fees charged by a bankruptcy petition preparer

may be forfeited in a case in which the bankruptcy petition preparer fails to comply with this

subsection or subsection (b), (c), (d), (e), (f), or (g)."  11 U.S.C. § 110(h)(3)(B).

    Ms. Pevzner repeatedly violated subsections (b), (c), and (h) of § 110.  Furthermore, it is

undisputed that each of the debtors paid fees for Ms. Pevzner's services: Mr. Silva testified that

he paid $1,200, and Ms. Julien testified that she paid $1,300.  Ms. Moore testified that she agreed

to pay a fee of $1,200 for her bankruptcy filing and that she paid $600 at her meeting at Mr.

Mollo's office, although there is no evidence in the record that she paid the balance of $600.

Given the sheer number of violations of § 110 committed by Ms. Pevzner, she should not receive

compensation for the work she performed in these cases.  Accordingly, Ms. Pevzner must

disgorge the $3,100 in fees she received from Ms. Moore, Mr. Silva, and Ms. Julien.

B.  <u>Section 110(k)</u>

Section 110(k) provides that "[n]othing in this section shall be construed to permit activities otherwise prohibited by law, including rules and laws that prohibit the unauthorized practice of law." 11 U.S.C. § 110(k).  "Bankruptcy courts look to state law to determine whether a bankruptcy petition preparer has engaged in the unauthorized practice of law."  <u>McDonald</u>, 318 B.R. at 47.  The unauthorized practice of law is prohibited in New York by § 478 of the New York Judiciary Law, which states:

> "[i]t shall be unlawful for any natural person to practice ... as an attorney-at-law or as an attorney and counselor-at-law for a person other than himself in a court of record in this state, or to furnish attorneys or counsel or an attorney and counsel to render legal services, or to hold himself out to the public as being entitled to practice law as aforesaid, or in any other manner, ... without having first been duly and regularly licensed and admitted to practice law in the courts of record of this state ...."

Under § 486 of the New York Judiciary Law, this provision also applies to suspended attorneys.  Here, the UST alleges that both Mr. Mollo and Ms. Pevzner engaged in the unauthorized practice of law by holding themselves out to the world as lawyers.  Mr. Mollo's license to practice law was suspended by the Appellate Division, Second Department, of the Supreme Court of the State of New York on January 9, 2012.  Although Mr. Mollo's suspension from practice in the Eastern District of New York became effective on February 25, 2012, after the <u>Moore</u> and <u>Shaw</u> cases were filed, he was legally prohibited from practicing bankruptcy law as of the date of his New York suspension.  This issue was squarely presented in <u>In re Lite Ray Realty Corp.</u>, 257 B.R. 150 (Bankr. S.D.N.Y. 2001), where an attorney who had been suspended from practicing law in New York State, but had not been suspended from practice in federal court, sought to represent a debtor in a bankruptcy case.  The court held that representation of a debtor in a bankruptcy case by a suspended attorney is impermissible, even if the attorney is

authorized to appear in federal court, because representation of a debtor in a bankruptcy case

necessarily involves consideration of, and advice concerning, questions of state law.  As the

court explained,

> [b]efore the client ever files a petition, he and his attorney must discuss the
> client's other choices since bankruptcy may not be the most appropriate
> alternative.  The attorney must advise the client on numerous state law issues,
> including the strength of the creditors' claims and any defenses, other forms of
> debt relief (e.g., compositions, extensions), and the consequences of not choosing
> bankruptcy or choosing to do nothing . . . .  If the lawyer does not know or cannot
> talk about state law issues, he cannot advise his client competently.  Furthermore,
> if the attorney can only practice bankruptcy, he may be influenced to tilt his
> advice toward filing for bankruptcy.

Id. at 155 (emphasis in original).

Moreover, Mr. Mollo clearly recognized that he was not permitted to hold himself out as

a bankruptcy attorney or to represent debtors in bankruptcy cases following his suspension, yet

continued to do so notwithstanding his representations to the UST and to this Court that he

would desist from this activity.  When the UST discovered that Mr. Mollo filed the Flowers case

on January 18, 2012, nine days after his suspension, and confronted him, Mr. Mollo assured the

UST in a letter dated January 24, 2012 that "I understand that my employees or myself will not

file petition[s] or appear in Bankruptcy Court until this matter [the suspension] is resolved."

Flowers, 2012 WL 987298 at *5.  Less than two days later, Mr. Mollo proceeded to file three

bankruptcy cases using another attorney's electronic signature.  Id. at *9.  Then, at the February

7, 2012 hearing on the UST's motion for sanctions based upon that conduct, Mr. Mollo, directly

and through his counsel, assured the Court that he would stop practicing law and take down his

website.  In his opening statement at that hearing, Mr. Mollo's attorney (with Mr. Mollo beside

him) assured the Court:

He's not appearing in any court and he's certainly not going to be holding himself out as an attorney. He understands that website has to come down. He understands that even his name with an "Esquire" next to it has to be removed from the telephone number in the Yellow Pages or the White Pages, for that matter.

Transcript of Hearing held February 7, 2012 at p. 12, lines 6-11, Flowers, 2012 WL 987298 (Case No. 12-40298).   Mr. Mollo testified, with respect to his website, as follows: "I had a meeting with the website person to close it down on Tuesday. He said it takes a little time. It doesn't come down right away, but I will call him again and tell him to do it faster."  Id. at p. 50, lines 17-20.  However, on February 9, 2012, only two days after the February 7 sanctions hearing, Mr. Mollo spoke with Ms. Moore on his cell phone and told her to contact his office to schedule an appointment to prepare her bankruptcy petition.  (Tr. 5/30/12 at 25: 15-17.) Moreover, as late as March 29, 2012, Mr. Mollo had still not taken down his website, which continued to advertise his services as an attorney.  (UST Ex. 14.)  As a result, Ms. Julien, when looking for a bankruptcy attorney on-line, saw Mr. Mollo's website, set up an appointment, and ultimately had her petition prepared and filed by Ms. Pevzner.

Ms. Pevzner's activities in preparing the debtors' bankruptcy petitions was also a violation of the New York Judiciary Law and § 110(k).  "[S]ummarizing or reformulating information provided by prospective debtors. . . constitute[s] the practice of law."  McDonald, 318 B.R. at 47-48.  (citations omitted).  As discussed above, Ms. Pevzner asked the debtors a series of questions and used a computer program to prepare their filings based on the answers she was given.  Ms. Pevzner decided whether to use Federal or state exemptions and determined what the debtors would include as exempt property. (Tr. 4/10/12 at 72: 15-20.)  This is unauthorized practice of law by a non-attorney.  The fact that Ms. Pevzner was aided by a computer does not change the result.  See, e.g., In re Kaitangian, 218 B.R. 102, 110 (Bankr. S.D.

Cal. 1998) ("[p]lugging in solicited information from questionnaires and personal interviews to a prepackaged bankruptcy software program constitutes the unauthorized practice of law."); In re Rojero, 399 B.R. 913, 920 (Bankr. D.N.M. 2008) ("[The bankruptcy petition preparer] made those elections, even if her bankruptcy software program automatically uses the [state] exemption statutes. Such actions constitute an unauthorized practice of law.")

Although § 110(l)(1) does not authorize courts to level fines for violations of § 110(k), Mr. Mollo and Ms. Pevzner should not receive compensation for their unauthorized practice of law.   See, e.g., In re Bernales, 345 B.R. 206, 215 (Bankr. C.D. Cal. 2006) (ordering the disgorgement of fees based on violations of §110(k)). Accordingly, the UST's request that Ms. Pevzner and Mr. Mollo be directed, jointly and severally, to disgorge pursuant to § 110 (k) all fees paid by the debtors in these three cases, is granted on this basis as well.

VII.    Mr. Mollo's Vicarious Liability for Ms. Pevzner's Violations of § 110

The UST argues that because Ms. Pevzner violated the provisions of § 110 while acting as Mr. Mollo's employee, Mr. Mollo should be held vicariously liable for Ms. Pevzner's violations.  It is well established that vicarious liability may be imposed for violations of federal statutes, even where not expressly authorized by the statute in question.  See, e.g., Mayer v. Holley, 537 U.S. 280 (2003) (imposing vicarious liability for violation of the Fair Housing Act); Soc'y of Mech.Eng'rs v. Hydrolevel Corp., 456 U.S. 556 (1982) (imposing vicarious liability for violation of antitrust laws);  Jones v. Federated Fin. Reserve Corp., 144 F.3d 961, 965 (6th Cir. 1998) (imposing vicarious liability for violation of the Fair Credit Reporting Act); Quick v. Peoples Bank of Cullman Cnty., 993 F.2d 793, 797 (11th Cir.1993) (imposing vicarious liability for violation of the Racketeer Influenced and Corrupt Organizations Act); U.S. v. O'Connell, 890 F.2d 563 (1st Cir. 1989) (imposing vicarious liability for violation of the False Claims Act);

Margan v. Niles, 250 F. Supp. 2d 63 (N.D.N.Y. 2003) (imposing vicarious liability for violation of the Driver's Privacy Protection Act).

In determining whether vicarious liability may be imposed for violation of a federal statute, a court must consider whether imposition of vicarious liability is consistent with Congressional intent.  See Hydrolevel, 456 U.S. at 568 ("imposing liability on [the principal]…honors the congressional intent behind the antitrust statutes"); Mayer, 537 U.S. at 285 (finding Congressional intent to impose vicarious liability in the context of the Fair Housing Act); Jones, 144 F.3d at 965 ("Because the FCRA does not directly address vicarious liability, we look to the statute's purposes for guidance in determining whether to interpret the FCRA's words to include liability based on the apparent authority of an employee").  When a statute is designed to protect the public, vicarious liability is appropriate to effectively deter the prohibited conduct, particularly where the activity in question is commonly conducted by employees or agents for the benefit of employers or principals. In imposing vicarious liability for violation of antitrust laws, the Supreme Court explained:

> It is true that imposing liability on ASME's agents themselves will have some deterrent effect, because they will know that if they violate the antitrust laws through their participation in ASME, they risk the consequences of personal civil liability. But if, in addition, ASME is civilly liable for the antitrust violations of its agents acting with apparent authority, it is much more likely that similar antitrust violations will not occur in the future. Pressure will be brought on the organization to see to it that its agents abide by the law.  Only ASME can take systematic steps to make improper conduct on the part of all its agents unlikely, and the possibility of civil liability will inevitably be a powerful incentive for ASME to take those steps.  Thus, a rule that imposes liability on the standard-setting organization—which is best situated to prevent antitrust violations through the abuse of its reputation—is most faithful to the congressional intent that the private right of action deter antitrust violations.

Hydrolevel, 456 U.S. at 572-73.  Courts considering applications of vicarious liability under other federal statutes have reached similar conclusions. E.g., Jones, 144 F.3d at 965-66

("[P]rotecting consumers from the improper use of credit reports is an underlying policy of the FCRA. An apparent authority theory is in keeping with the FCRA's underlying deterrent purpose because employers are in a better position to protect consumers by use of internal safeguards"); Margan, 250 F. Supp. 2d at 74-75 (finding vicarious liability appropriate to further statutory goal of protecting individuals' personal information).

Here, vicarious liability is consistent with Congress' underlying purpose in setting guidelines for bankruptcy petition preparers and imposing fines for violation of those guidelines. In enacting § 110, Congress was concerned that

> far too many [petition preparers] attempt to provide legal advice and legal services to debtors. These preparers often lack the legal training and ethics regulation to provide such services in an adequate and appropriate manner. These services may take unfair advantage of persons who are ignorant of their rights both inside and outside the bankruptcy system.

140 Cong. Rec. H10,770-01 (daily ed. Oct. 4, 1994). It is clear that the purpose of § 110 was to deter bankruptcy petition preparers from taking advantage of unsophisticated debtors by requiring, among other things, that the petition preparers disclose their identities and the compensation they receive when filing documents that they have prepared. In order to properly effectuate its deterrent effect, it is not only necessary to hold accountable the petition preparers themselves, but also employers who facilitate and profit from these activities, and who are in the best position to ensure that proper safeguards are in place to protect the debtors. This is particularly true because petition preparation is commonly performed by employees on behalf of employers. See, e.g., In re Gaftick, 333 B.R. 177, 186 (Bankr. E.D.N.Y 2005) (vicarious liability for § 110 violations imposed on We the People of Sheepshead Bay, New York, Inc., a document preparation service franchisee, and upon its franchisor, We the People Forms and Service

Centers USA, Inc., where documents in question were prepared by an individual working in the franchisee's office).

Although the UST's argument for vicarious liability is based on respondeat superior, two additional bases for imposing vicarious liability are also applicable on the facts of this case. As the Sixth Circuit explained in <u>Jones</u>, vicarious liability may be imposed based upon actual authority, respondeat superior, or apparent authority:

> First, a principal may be vicariously liable for an agent's tortious conduct if the principal expressly or implicitly authorized the conduct…Second, a principal may be vicariously liable for an agent's torts under a respondeat superior theory. Under a respondeat superior rule, a principal is only held vicariously liable for torts committed by an agent when the agent acts for the benefit of his principal within the scope of his employment. Third, a principal may be vicariously liable for an agent's tortious conduct based upon an apparent authority theory, if the principal cloaked its agent with apparent authority, i.e., held the agent out to third parties as possessing sufficient authority to commit the particular act in question, and there was reliance upon the apparent authority.

<u>Jones</u>,144 F.3d at 965 (internal citations omitted). Here, vicarious liability is appropriately imposed on Mr. Mollo based upon each of these doctrines.

Under respondeat superior, an employer of a bankruptcy petition preparer is vicariously liable for the preparer's violation of § 110 if the violation was "committed by his servant while acting within the scope of his employment." <u>Gaftick</u>, 333 B.R. at 186. Here, Mr. Mollo and Ms. Pevzner contend that not only was Ms. Pevzner not an employee of Mr. Mollo when she filed the bankruptcy petitions in question, but that she was never an employee of Mr. Mollo. Any services that Ms. Pevzner provided, they assert, were provided as favors from a friend as opposed to work performed by an employee.

The evidentiary record does not support this claim, and in fact compels the opposite conclusion. It is undisputed that Ms. Pevzner regularly provided services at Mr. Mollo's office since 2006 by answering the phones, drafting letters, and preparing bankruptcy petitions. Ms.

Pevzner also received regular compensation.  Ms. Pevzner testified that she received payment from Mr. Mollo every month during the prior three years for a total of $10,153 in 2010, $12,375 in 2011, and $3,000 in 2012.  (Tr. 5/30/12 at 79: 7-15; UST Ex. 32.) For his part, Mr. Mollo testified that the pay Ms. Pevzner received was directly tied to the monetary success of his office. (See Tr. 5/30/12 at 138:24-139:1) ("[I]f there's no income, there's nothing to share, there's no gift.  If there's enough income, then there can be.")  Finally, Ms. Pevzner's own online resume, which she testified that she prepared, identifies her as an employee at the Law Offices of Peter Mollo.  (UST Ex. 33.)

This Court finds that the fact that Ms. Pevzner worked in Mr. Mollo's law office, regularly performed ordinary law office tasks of a paralegal or administrative assistant there, and consistently received compensation for these tasks, can only support the conclusion that Ms. Pevzner is an employee of Mr. Mollo, regardless of the label the two assign to their relationship. Moreover, with respect to the liability of a principal for torts committed by his employee, the Restatement of Agency provides that "the fact that work is performed gratuitously does not relieve a principal."  Restatement (Third) of Agency § 7.07(3)(b) (2006). Accordingly, whether Ms. Pevzner was a paid employee of Mr. Mollo or a volunteer, as Ms. Pevzner claims, Ms. Pevzner indisputably worked as an employee for Mr. Mollo.

With respect to respondeat superior, the analysis then focuses on whether Ms. Pevzner's violations of § 110 occurred "while the servant was doing his master's work, no matter how irregularly, or with what disregard for instructions."  Gaftick, 333 B.R. at 185, quoting Riviello v. Waldron, 47 N.Y.2d 297, 302, (1979).  In making that determination, the following factors are considered:

> [1] the connection between the time, place and occasion for the act, [2] the history of the relationship between employer and employee as spelled out in actual

practice, [3] whether the act is one commonly done by such employee, [4] the extent of departure from normal methods of performance, [and] [5] whether the specific act was one that the employer could reasonably have anticipated.

Id.

Application of the foregoing factors in these cases leads to the conclusion that Ms. Pevzner's violations of § 110 occurred within the scope of her work for Mr. Mollo. All of the violations occurred during business hours in Mr. Mollo's office. Ms. Pevzner has been performing services, including the preparation of bankruptcy petitions for Mr. Mollo, since 2006. In each of these cases, Ms. Pevzner was performing the very type of work she performed for Mr. Mollo before his law license was suspended. These violations were certainly foreseeable: the evidence shows that Mr. Mollo knew exactly what was taking place in his office. Indeed, Ms. Moore testified that when she called Mr. Mollo seeking help with filing her bankruptcy petition, he directed her to call Ms. Pevzner at his office; and when she arrived at her appointment at Mr. Mollo's office, she paid Mr. Mollo and he told her Ms. Pevzner would be meeting with her. Moreover, Mr. Mollo was aware that Ms. Pevzner was including Alan Bond's name on retainer agreements, even though he testified that Mr. Bond had no involvement in these cases.

Although Mr. Mollo and Ms. Pevzner repeatedly insisted in their testimony that Ms. Pevzner was operating independently, their testimony was neither credible nor supported by the record. Rather, the record supports the opposite conclusion: Mr. Mollo referred clients, at least one of which he received payment from, to Ms. Pevzner, his longtime employee, for the purpose of having Ms. Pevzner prepare the client's petition on his computer in his office, and that as such, she acted as his employee.

Turning next to actual or implied authority and apparent authority, Mr. Mollo is vicariously liable for Ms. Pevzner's violations because the evidence shows that Ms. Pevzner acted with Mr. Mollo's actual or implied authority, and acted with apparent authority.

Actual authority exists when "at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006). Apparent authority exists "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03 (2006). See also Jones, 144 F.3d at 965 (where a principal "h[olds] the agent out to third parties as possessing sufficient authority to commit the particular act in question, and there was reliance upon the apparent authority"). Vicarious liability is predicated on "the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." Id., citing Hydrolevel, 456 U.S. at 566.

Here, Mr. Mollo allowed, and facilitated, Ms. Pevzner's bankruptcy petition preparation in his office. This arrangement gave the impression that she was employed by him, and allowed her to beneficially use her association with him when dealing with debtors, including charging fees at rates consistent with those of an attorney. The debtors in each of the three cases testified that their relationship with Ms. Pevzner and Mr. Mollo originated with an attempt to contact Mr. Mollo as a bankruptcy attorney, not Ms. Pevzner as a petition preparer. Ms. Julien testified that at her meeting at Mr. Mollo's office, she was told that she would be accompanied to court by either "[Ms. Pevzner] or Mr. Mollo." (Tr. 4/10/12 at 40:13-18.) She further testified that when

she called the office, the phone was answered "Peter Mollo's office."  (Tr. 4/10/12 at 39:5-8.)

Ms. Moore testified that Mr. Mollo assured her that he would be there for her appointment, that

he was in fact present at the appointment, that Mr. Mollo "wanted the money," and that she "put

the money in Mr. Mollo's hand."  (Tr. 5/30/12 at 25:15-17; 26:11-14; 26:19-22; 27:9-10.)  Mr.

Silva testified that Mr. Mollo was briefly present during a meeting at his office.  (Tr. 5/30/12 at

57:20-23.)  At no time did Mr. Mollo or Ms. Pevzner inform the debtors in these cases that Ms.

Pevzner was operating completely independently of Mr. Mollo in order to counteract the clear

impression that Ms. Pevzner was an employee of Mr. Mollo.

These facts show that Mr. Mollo actually or impliedly authorized Ms. Pevzner's actions.

In addition, Ms. Pevzner's violations of § 110 fall squarely within the realm of apparent

authority.  The violations occurred in a context where she appeared to be working as an

employee of Mr. Mollo and Mr. Mollo was directly responsible for creating that appearance.

In light of Mr. Mollo's pattern of misconduct, the overwhelming evidence that Ms.

Pevzner was still acting as Mr. Mollo's employee, and the obvious existence of a principal-agent

relationship, Mr. Mollo is vicariously liable for Ms. Pevzner's violations and responsible

financially for them.

## <u>CONCLUSION</u>

For the reasons set forth above, the UST's motion is granted.  Mr. Mollo and Ms. Pevzner

are fined, jointly and severally, in the amount of $45,000 and Mr. Mollo and Ms. Pevzner are

directed to disgorge $3,100 in fees received from Ms. Julien, Ms. Moore, and Mr. Silva.  A

separate order will issue.

**Dated: Brooklyn, New York**
**September 28, 2012**

_____

**Carla E. Craig**
**United States Bankruptcy Judge**